MARK J. BOURASSA, ESQ.
Nevada Bar No. 7999
JENNIFER A. FORNETTI, ESQ.
Nevada Bar No 7644
**THE BOURASSA LAW GROUP**
2350 W. Charleston Blvd., #100
Las Vegas, Nevada 89102
Tel: (702) 851-2180
Fax: (702) 851-2189
Email: mbourassa@blgwins.com
         jfornetti@blgwins.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **JEFFREY SCOTT CAMERON**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**MGM RESORTS INTERNATIONAL,**<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Scott Cameron ("Plaintiff"), on behalf of himself and all others similarly situated, asserts the following against MGM Resorts International ("MGM" or "Defendant"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## INTRODUCTION

1.      Businesses that collect and store sensitive information about their customers have a duty to safeguard that information and ensure it remains private. This responsibility is essential where a business keeps and stores its customers' Personally Identifiable Information (or "PII") such as their first and last names, driver's license numbers, home addresses, telephone numbers, email addresses, and dates of birth.

2.      Plaintiff Cameron brings this class action individually and on behalf of individuals that suffered, and continue to suffer, damages as a result of MGM's failure to properly secure and

safeguard the Personally Identifiable Information described above ("Personally Identifiable Information").

3.    On or about September 5, 2019, MGM notified affected customers and various governmental agencies that "[o]n or about July 7, 2019, an individual accessed MGM Resorts International's computer network system without permission. The individual downloaded partial customer data from MGM's computer systems, then posted and disclosed part of the data on a closed internet forum" (the "MGM Data Breach").

4.    Publicly available information indicates more than 200 million MGM customers may have had their Personally Identifiable Information compromised in the MGM Data Breach.

## PARTIES

5.    Plaintiff Jeffrey Scott Cameron resides in and is a citizen of San Diego County, California.

6.    Plaintiff has been a customer of MGM since at least August 2018, having made multiple reservations and gambling at the MGM Grand in Las Vegas, Nevada, providing his Personally Identifiable Information to MGM in its normal course of business. Plaintiff is a member of MGM's M life Rewards program.

7.    Defendant MGM Resorts International is a Delaware corporation with a principal place of business at 3600 Las Vegas Blvd, South Las Vegas, NV 89109. MGM is a citizen of Delaware and Nevada.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff, being a resident of California, is diverse from MGM, which is headquartered in Nevada and organized under the laws of Delaware. Plaintiff alleges that, in the aggregate, the claims of all putative Class members exceed $5,000,000, exclusive of interest and costs.

9.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because MGM is, and at all relevant times was, a citizen of Nevada and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the District of Nevada.

## **FACTUAL BACKGROUND**

10.    According to MGM, it is "is an S&P 500® global entertainment company with national and international locations featuring best-in-class hotels and casinos, state-of-the-art meetings and conference spaces, incredible live and theatrical entertainment experiences, and an extensive array of restaurant, nightlife and retail offerings." MGM, About MGM Resorts, https://www.mgmresorts.com/en/company.html (last accessed Feb. 25, 2020).

11.    MGM collects, stores, and maintains its customers' Personally Identifiable Information. MGM, Privacy Policy, https://www.mgmresorts.com/en/privacy-policy.html ("A. Personal Information. When you visit, use, and/or access MGM Resorts or MGM Online Services, you may provide us with (and/or we may collect) information by which you can be personally identified including your name, date of birth, postal address, e mail address, and telephone number, and videos, recordings, and images of you ("Personal Information"). We may also obtain Personal Information from third parties.") (last accessed Feb. 25, 2020).

12.    By July 7, 2019, hackers gained access to MGM's information systems and stole the Personally Identifiable Information of potentially more than 200 million MGM customers.

13.    The information obtained by the hackers includes the affected individuals' first and last names, driver's license numbers, home addresses, telephone numbers, email addresses, and dates of birth.

14.    According to the cybersecurity firm KELA, the hackers were distributing the Personally Identifiable Information in hacking forums by at least east July 13, 2019. See Catalin Cimpanu, ZDNet, Exclusive: Details of 10.6 million MGM hotel guests posted on a hacking forum (Feb. 19, 2020), https://www.zdnet.com/article/exclusive-details-of-10-6-million-of-mgm-hotel-guests-posted-on-a-hacking-forum/ (last accessed Feb. 25, 2020).

/ / /

/ / /

15.    Below is a screenshot of one post, written in Russian and identifying MGM by name, listing the stolen information.



In English, the post reads:

10.6 million records out of a database of 200+million.

Contains fields: name\e-mail\birthdate\telephone\address.

No passwords and not all lines are filled with all data.

Year and link reference to news about the leak not found.

I am spreading for informational purposes.

16.    According to ZDNet, the above "data dump" contains the Personally Identifiable Information of 10,683,188 MGM customers. Catalin, *supra*. Below is a screenshot of the file containing the stolen information.

*See* Cimpanu, *supra*.

17.     Another leading cybersecurity expert confirmed the MGM Data Breach compromised 3,081,321 unique email addresses stemming back to 2017.  HIBP, Troy Hunt, Pwned websites, https://haveibeenpwned.com/PwnedWebsites#MindJolt (last accessed Feb. 25, 2020).

18.     Despite hackers identifying it by name as early as July 13, 2019, MGM claims it did not determine which customers were affected until August 9, 2019.

19.     Then, once making this determination, MGM waited until at least August 22, 2019 to notify the customers whose Personally Identifiable Information was compromised in the MGM Data Breach. Vegas Message Board, Data breach at MGM Resorts in July 2019?, https://www.vegasmessageboard.com/forums/index.php?threads/data-breach-at-mgm-resorts-in-july-2019.165346/ (last accessed Feb. 25, 2020).

20.     To date, MGM has not explained why it took more than a month to discover and determine what information was compromised or why it took another two weeks after that determination to notify its affected customers.

21.     The breadth of data compromised in the MGM Data Breach makes the information particularly valuable to thieves and leaves MGM's customers especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

22.     To this end, "[n]ew research from Harvard University shows why information from a breach like [the MGM Data Breach] is for sale: it is valuable for targeted cyberattacks in the future." Bruce Sussman, SecureWorld, Celebrity A-Listers, Millions of Guests Have Data Stolen in MGM Resorts Breach, https://www.secureworldexpo.com/industry-news/mgm-resorts-data-breach-details (last accessed Feb. 25, 2020). "Using the anonymizing Tor software, the pair [of Harvard researchers] managed to find a number of forums on the Dark Web where hackers share data leaks. They found a dataset from the 2015 Experian breach with information on over six million individuals. They decided to pursue a subset of this information, so they focused on data that the forum said was related to the Washington D.C. area. Based on that search, they located more than 40,000 unique email addresses. Next, they used one of the Dark Web's many

archiving sites, where you can plug in an email address and discover all the data leaks in which that email appears. That information led them to credentials, passwords, and usernames. Once they rejoined this information with the Experian dataset, they connected each online presence to a real-world identity." *Id.* "For example, in less than 10 seconds [the Harvard researchers] produced a dataset with more than 1,000 people who have high net worth, are married, have children, and also have a username or password on a cheating website. Another query pulled up a list of senior-level politicians, revealing the credit scores, phone numbers, and addresses of three U.S. senators, three U.S. representatives, the mayor of Washington, D.C., and a Cabinet member." Harvard School of Engineering, Adam Zewe, Imperiled information, https://www.seas.harvard.edu/news/2020/01/imperiled-information (last accessed Feb. 25, 2020).

23.     MGM was aware of its duty to safeguard the Personally Identifiable Information that it collected, and its customers relied on MGM to take every precaution to safeguard their Personally Identifiable Information.

24.     Plaintiff is a member of MGM's M Life Rewards program. MGM launched the M Life Rewards program on January 11, 2011 to "allow[ ] members to not only accumulate rewards on gambling, but also their total resort stay." Amanda Finnegan, Las Vegas Sun, MGM Resorts launches M Life rewards program, will track nongaming spending, https://lasvegassun.com/news/2011/jan/11/mgm-resorts-launches-m-life-rewards-program-will-t/ (last accessed Feb. 27, 2020).

25.     Since at least October 2, 2017, MGM's website has disclosed that "[b]y enrolling in the M life Rewards Program and/or using your Card, members consent to the terms of the MGM Privacy Policy and the sharing of their personal information among all casinos, resorts, and properties of MGM Resorts International. Internet Archive Wayback Machine, MGM Resorts M life Rewards, https://web.archive.org/web/20171002095927/https://www.mgmresorts.com/en/mlife-rewards-program/program-rules.html (archived on Oct. 2, 2017) (last accessed Feb. 27, 2020). At that time, MGM's August 7, 2017 Privacy Policy defined Personal to include customers' " name, date

of birth, postal address, e-mail address, and telephone number, and videos, recordings, and images of you." Internet Archive Wayback Machine, MGM Resorts Privacy Policy, https://web.archive.org/web/20170927220503/https://www.mgmresorts.com/en/privacy-policy.html (archived on Sept. 10, 2017) (last accessed Feb. 27, 2020). The August 7, 2017 Privacy Policy further disclosed that MGM might also collect "information about the vehicle you park including an image of the vehicle, the vehicle's make, model, and license plate number[,]" "information about your purchases, reservations, and gaming activity," "credit or debit card number, financial account number, biometrics, driver's license number, government-issued identification card number, social security number, passport number, or naturalization number[,]" among other information. *Id.*

26.    MGM collects even more information about its customers and M life Reward program members today, including their "name, e-mail address, postal mail address, telephone number, date of birth, credit card number, passport number, driver's license number, bank account number, social security number; legally protected characteristics including gender, race, and sexual orientation; commercial information including your gaming, entertainment, travel, dining, lodging, and business transactions; audio, visual, and biometric-related information including facial recognition information; professional or employment information." MGM, Privacy Policy, https://www.mgmresorts.com/en/privacy-policy.html (effective Jan. 1, 2020) (last accessed Feb. 27, 2020).

27.    Since 2018, Plaintiff has made at least two reservations at the MGM Grand Hotel & Casino in Las Vegas, including a three-night stay in August 2018 and a four-night stay in April 2019.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

28.    Plaintiff is aware of providing at least the following information to MGM as part of his membership in MGM's M life Rewards program: first name, last name, email address, password, telephone number, date of birth, home address, and security question answer. In turn, when Plaintiff made reservations at MGM locations, he would sign into his M life Rewards program account, which would populate the reservation fields with his Personal Information.

See MGM, M life Rewards Account Setup, https://www.mgmresorts.com/en/sign-up.html (last accessed Feb. 27, 2020).

29.    Plaintiff is also aware MGM has a record of his gambling wins and losses.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

30.    MGM failed to safeguard Plaintiff's Personally Identifiable Information and, as a result, Plaintiff's Personally Identifiable Information was exposed as part of the MGM Data Breach.

31.    According to MGM's notice of the MGM Data Breach, at minimum, Plaintiff's "First Name, Last Name, and Driver's License Number" were compromised in the MGM Data Breach.

32.    As the result of the wide variety of injuries that can be traced to the MGM Data Breach, Plaintiff and class members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.    purchasing goods and services they would not have otherwise paid for and/or paying more for good and services than they otherwise would have paid, had they known the truth about MGM's substandard data security practices;

b.    losing the inherent value of their Personally Identifiable Information;

c.  losing the value of the explicit and implicit promises of data security;

d.  identity theft and fraud resulting from the theft of their Personally Identifiable Information;

e.  costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

f.  costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g.  costs associated with replacing identification documents;

h.  loss of value of reward points accumulated through the purchase of goods or services;

i.  unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

j.  lowered credit scores resulting from credit inquiries following fraudulent activities;

k.  costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and

l.  the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

33.    For example, because of the sensitive information he has provided MGM and other businesses, which information is now freshly compromised as a result of the MGM Data Breach, Plaintiff purchased a premium subscription to a password manager. This password manager "combines unlimited password storage synced across all your devices with Dark Web Monitoring and a VPN for WiFi protection. Plaintiff pays $4.99 per month, billed annually, for this password management service. Dashlane, Plans, https://www.dashlane.com/plans/premium (last accessed Feb. 27, 2020).

34.    Even in instances where a consumer is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement that is not refunded. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud. E. Harrell, U.S. Department of Justice, Victims of Identity Theft, 2014 (revised Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last accessed Feb. 26, 2020).

35.    There may also be a significant time lag between when personal information is stolen and when it is actually misused. According to the Government Accountability Office, which conducted a student regarding data breaches: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm." U.S. Government Accountability Office Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Feb. 26, 2020).

36.    The cost of purchasing a hotel room includes tangible and intangible components, including things such as the overall cost of the property and employee costs, as well as the costs of providing conveniences like soaps and shampoos. One component of the cost of a hotel room is the explicit and implicit promises MGM made to protect its customers' Personally

Identifiable Information. Because the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like MGM would have no reason to tout their data security efforts to their actual and potential customers.

37.    Consequently, had consumers known the truth about MGM's data security practices—that they did not adequately protect and store their data—they would not have stayed at an MGM property, purchased products or services at an MGM property, and/or would have paid less. As such, Plaintiff and class members did not receive the benefit of their bargain with MGM because they paid for the value of services they expected but did not receive.

38.    MGM itself acknowledged the harm caused by its MGM Data Breach because it offered affected customers twelve months of complimentary "12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services" as a result of the MGM Data Breach. However, such services are woefully inadequate to protect Plaintiff and the Class members from a virtual lifetime of identity theft risk and does nothing to reimburse Plaintiff and the Class members from the injuries they have already suffered. Indeed, such services may do nothing to protect from common uses of Personally Identifiable Information by hackers such as potential fraud, tax fraud, or fraudulent business or payday loans, for instance.

**CLASS ACTION ALLEGATIONS**

39.    Plaintiff brings this action individually and as a class action on behalf of the following nationwide and California classes (collectively, the "Class"):

**Nationwide Class**

All persons in the United States (including its Territories and the District of Columbia) whose Personally Identifiable Information was compromised as a result of the MGM Data Breach.

**California Subclass**

All persons in California whose Personally Identifiable Information was compromised as a result of the MGM Data Breach.

40.     Excluded from the Class are MGM and its officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

41.     The members of the Class are so numerous and geographically dispersed that joinder would be impracticable. Conservative estimates of the MGM Data Breach suggests that the number of Class members exceeds 10 million. Class members are readily identifiable from information and records in MGM's possession, custody, or control.

42.     There is a well-defined community of interest in the common questions of law and fact affecting the Class members. These common legal and factual questions include, but are not limited to:

   a.  whether MGM owed a duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and members of the Class when obtaining, storing, using, and managing Personally Identifiable Information, including taking action to safeguard such data;

   b.  whether MGM failed to safeguard Plaintiff's and the Class members' Personally Identifiable Information;

   c.  whether MGM implemented and maintained data security measures that it knew or should have known were unreasonable and inadequate to protect Personally Identifiable Information;

   d.  whether MGM negligently allowed Personally Identifiable Information to be accessed, used, or disclosed by third parties;

   e.  whether MGM failed to timely and adequately notify Plaintiff and members of the Class that its data systems were breached;

f.    whether Plaintiff and members of the Class were injured;

g.    whether MGM's actions and inactions failed to provide reasonable security

h.    whether MGM's actions and inactions proximately caused the injuries suffered by Plaintiff and members of the Class;

i.    whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

j.    whether Plaintiff and members of the Class are entitled to injunctive, equitable, declaratory and/or other relief, and if so, the nature of such relief.

43.    Plaintiff's claims are typical of the claims of the absent class members and have a common origin and basis. Plaintiff and absent Class members are all injured by the MGM Data Breach. Plaintiff's claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely the MGM MGM Data Breach. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and seek the same relief. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

44.    Plaintiff will fully and adequately assert and protect the interests of the absent Class members and have retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiff nor Plaintiff's attorneys have any interests contrary to or conflicting with the interests of absent Class members.

45.    The questions of law and fact common to all Class members predominate over any questions affecting only individual class members.

46.    A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also

permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiff knows of no difficulties in managing this action that would preclude its maintenance as a class action.

47.    Additionally, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for MGM. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. MGM, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

**CHOICE OF LAW**

48.    MGM's acts and omissions discussed herein were orchestrated and implemented at its corporate headquarters in Nevada and the tortious and deceptive acts complained of occurred in, and radiated from, Nevada.

49.    The key wrongdoing at issue in this litigation (MGM's failure to employ adequate data security measures) emanated from MGM's headquarters in Nevada.

50.    Upon information and belief, MGM's information technology personnel operate out of and are located at MGM's headquarters in Las Vegas, Nevada. To this end, MGM is currently looking to hire a Lead Information Security Analyst and a Lead Data Integration/Engineering Architect, both positions based in Las Vegas, Nevada. Candidates for the first position must have a "[s]olid knowledge of security access management processes and tools required to support a successful security services system is required."[1] The second position will be responsible for "[d]evelop[ing] and re-engineer[ing] the data acquisition, storage,

---

[1] Indeed, MGM Resorts International, Lead Information Security Analyst, https://www.indeed.com/viewjob?jk=3fc62cf9064860a2&tk=1e211ob4b34pv000&from=serp&vjs=3 (posted Feb. 5, 2020) (last accessed Feb. 26. 2020) (copy saved by Plaintiff's counsel).

processing, security, data management, and analysis using Cloud and on-premise technologies leading towards a modern data platform."[2]

51.    Nevada, which seeks to protect the rights and interests of Nevada and other U.S. businesses against a company doing business in Nevada, has a greater interest in the claims of Plaintiff and the Class members than any other state and is most intimately concerned with the outcome of this litigation.

52.    Application of Nevada law to a nationwide Class with respect to Plaintiff's and the Nationwide Class members' claims is neither arbitrary nor fundamentally unfair because Nevada has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Nationwide Class.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE

#### On behalf of the Nationwide Class

53.    Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

54.    MGM requires Plaintiff and Class members to submit Personally Identifiable Information in order to obtain goods and services from MGM.

55.    The Office of Management and Budget defines PII as "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual. Some information that is considered to be PII is available in public sources such as telephone books, public Web sites, and university listings. This type of information is considered to be Public PII and includes, for example, first and last name, address, work telephone number, email address, home telephone number, and general educational credentials. The definition of PII is not anchored to any single category of information or technology. Rather, it requires a case-by-case assessment

---

[2] Indeed, MGM Resorts International, Lead Data Integration Architect, https://www.indeed.com/viewjob?jk=629768ef57257e28&tk=1e2120r7j34pv000&from=serp&vjs=3 (posted more than 30 days before Feb. 26, 2020) (last accessed Feb. 26, 2020) (copy saved by Plaintiff's counsel).

of the specific risk that an individual can be identified. Non–PII can become PII whenever additional information is made publicly available, in any medium and from any source, that, when combined with other available information, could be used to identify an individual." 2 C.F.R. § 200.79 (effective Dec. 26, 2013).

56.    MGM knew or should have known the risks inherent in collecting and storing the Personally Identifiable Information of plaintiff and the Class members.

57.    MGM owed a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and members of the Class when obtaining, storing, using, and managing Personally Identifiable Information, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class members of any breach in a timely manner so that appropriate action can be taken to minimize or avoid losses.

58.    This duty extends to protecting others against the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where an actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts §302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard Personally Identifiable Information.

59.    Plaintiff and the Class members were the intended beneficiaries of MGM's duty to safeguard Personally Identifiable Information, creating a special relationship between them and MGM. Indeed, Plaintiff and the Class members entrusted MGM with their Personally Identifiable Information in order to obtain health care related goods and/or services from MGM, and they relied on MGM to maintain reasonable and adequate security measures in order to protect that Personally Identifiable Information from disclosure. Only MGM was in a position to ensure that its systems were sufficient to protect the Personally Identifiable Information that Plaintiff and the Class members entrusted to it.

60.    It was foreseeable that injury to Plaintiff and Class members would result from MGM's active mishandling of Personally Identifiable Information including, but not limited to,

MGM's failure to use reasonable security measures to protect such Personally Identifiable Information and to provide timely notice of the data breach.

61. MGM assumed the duty to act with reasonable care in managing its data, and to use reasonable security measures to protect such data, as a result of its conduct and privacy policies in which the Company repeatedly states that it would protect Plaintiff's and the Class members' Personally Identifiable Information. Through these statements, MGM specifically assumed the duty to comply with the data security industry standards.

62. MGM knew or should have known of the significant risk that its computer systems would be breached, in particular in light of the numerous recent data breach incidents around the country.

63. MGM breached its common law duties and industry standards of care—and was negligent—by actively mishandling the Personally Identifiable Information of Plaintiff and Class members and by failing to use reasonable and adequate security measures to protect that Personally Identifiable Information from the hackers who perpetrated the MGM Data Breach, by failing to identify the MGM Data Breach in a timely manner, and by failing to provide timely notice of the MGM Data Breach once discovered.

64. MGM breached its duties by: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized disclosure, misuse, alteration, destruction or other compromise of such information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; and/or (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein.

65. As a direct and proximate result of MGM's negligent acts of misfeasance and nonfeasance, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and

services or would have paid less for such goods and services but for MGM's misconduct alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

## COUNT II – NEGLIGENCE PER SE

### On behalf of the Nationwide Class

66.    Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

67.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair…practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair practice of failing to act reasonably in the management of the data, and to use reasonable security measures to protect such data by companies such as MGM. FTC guidelines, publications, and consent orders described above also form the basis of MGM's duty.

68.    MGM violated Section 5 of the FTC Act (and similar state statutes) by mishandling Plaintiff's and the Class members' Personally Identifiable Information, failing to use reasonable measures to protect the Personally Identifiable Information, and by not complying with applicable industry standards.

69.    MGM's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

70.    Plaintiff and the Class are within the scope of persons that Section 5 of the FTC Act (and similar state statutes) was intended to protect.

71.    Furthermore, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class here.

72.     As a direct and proximate result of MGM's negligence per se, Plaintiff and the Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and services or would have paid less for such goods and services but for MGM's misconduct alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

## COUNT III – NEGLIGENT MISREPRESENTATION
### On behalf of the Nationwide Class

73.     Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

74.     MGM misrepresented material information to Plaintiff and the Class by misrepresenting that it would protect the confidentiality of their Personally Identifiable Information, including by implementing and maintaining reasonable data security measures. To this end, at all relevant times, MGM's privacy policy has provided: "Information maintained in electronic form that is collected by MGM Resorts International and any individual MGM Resort is stored on systems protected by industry standard security measures. These security measures are intended to protect these systems from unauthorized access. No security system is impenetrable and these systems could become accessible in the event of a security breach. We have controls in place that are designed to detect potential data breaches, contain and minimize the loss of data, and conduct forensic investigations of a breach." Compare MGM, Privacy Policy, effective Jan. 1, 2020, https://www.mgmresorts.com/en/privacy-policy.html (last accessed Feb. 25, 2020); Internet Archive Wayback Machine, MGM, Privacy Policy, Nov. 7, 2017, https://web.archive.org/web/20171107043952/https://www.mgmresorts.com/en/privacy-policy.html (last accessed Feb. 25, 2020).

75.     These misrepresentations were material and made intentionally and knowingly with the intent that Plaintiff and Class members rely on them.

76.     MGM knew or should have known that by collecting and storing Personally Identifiable Information, Plaintiff and Class members would reasonably rely on MGM's representations that its servers were secure and that MGM would use "industry standard security measures."

77.     MGM' representations were material to Plaintiff and Class members, given the extreme sensitivity, value, and importance of the Personally Identifiable Information maintained by MGM.

78.     Had MGM disclosed to Plaintiff and Class members that its systems were not secure and thus vulnerable to attack, Plaintiff and the Class members would not have entrusted their Personally Identifiable Information to MGM.

79.     As a direct and proximate result of MGM's material misrepresentations and omissions, Plaintiff and Class members have suffered injury-in-fact, monetary and non-monetary damages, and an increased certainly impending risk of fraudulent banking activity, and/or identity theft, as described herein.

80.     Plaintiff and the Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and services or would have paid less for such goods and services but for MGM's misconduct alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

**COUNT IV – BREACH OF IMPLIED CONTRACT**

**On behalf of the Nationwide Class**

81.     Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

82.    Plaintiff and Class members entered into an implied contract with MGM when they obtained services from MGM and provided their Personally Identifiable Information to MGM.

83.    As part of these transactions, MGM agreed to safeguard and protect the Personally Identifiable Information of Plaintiff and Class Members and to timely and accurately notify them if their Personally Identifiable Information was breached or compromised.

84.    Plaintiff and Class members entered into the implied contracts with the reasonable expectation that MGM's data security practices and policies were reasonable and consistent with industry standards. Plaintiff and Class members reasonably believed that MGM would use part of the monies paid to MGM under the implied contracts to fund adequate and reasonable data security practices.

85.    Plaintiff and Class members would not have provided and entrusted their Personally Identifiable Information to MGM, or would have paid less for MGM's services, in the absence of MGM's implied promise to use reasonable measures to safeguard its customers' Personally Identifiable Information. The safeguarding of the Personally Identifiable Information of Plaintiff and Class members, and the prompt and sufficient notification of a breach, were both intended terms of the parties' contracts.

86.    Plaintiff and class members fully performed their obligations under the implied contracts with MGM.

87.    MGM breached its implied contracts with Plaintiff and Class members to protect their Personally Identifiable Information when it: 1) failed to have security protocols and measures in place to protect that information; 2) disclosed or failed to prevent the disclosure of that information to unauthorized third parties; and 3) failed to timely and accurately provide notice that customers' Personally Identifiable Information was compromised as a result of a data breach.

88.    As a direct and proximate result of MGM's breaches of implied contract, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and services or would have paid

less for such goods and services but for MGM's misconduct alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

## COUNT V – UNJUST ENRICHMENT

### On behalf of the Nationwide Class

89.    Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

90.    Plaintiff and Class members have an interest, both equitable and legal, in the Personally Identifiable Information about them that was conveyed to, collected by, and maintained by MGM and that was ultimately stolen in the data breach.

91.    MGM benefitted from the receipt of Plaintiff and Class members' Personally Identifiable Information and by its ability to retain and use that information for a variety of purposes. MGM understood that it was benefitting from receipt of its customers' Personally Identifiable Information.

92.    MGM also understood and appreciated that the Personally Identifiable Information pertaining to Plaintiff and Class members was private and confidential, and that its value and usefulness depended upon MGM maintaining the privacy and confidentiality of that Personally Identifiable Information.

93.    Plaintiff and Class members would not have transmitted their Personally Identifiable Information to MGM or entrusted MGM with possession of the Personally Identifiable Information but for MGM's express and implied commitments to maintain adequate security measures to protect that information.

94.    Plaintiff and Class members believed and expected that MGM would devote a reasonable portion of the monies spent by Plaintiff and the Class members for MGM's services to provide reasonable data security.

95.    Instead, MGM chose not to devote a reasonable portion of its income attributable to Plaintiff and Class members to establish reasonable security measures that would protect Plaintiff and Class members' Personally Identifiable Information.

96.    MGM thus retained the benefit conferred by Plaintiff and Class members to reduce its overall expenditures and boost its profits.

97.    As a result of MGM's wrongful conduct as alleged in this Complaint—including, among other things, MGM's knowing failure to employ adequate data security measures, its continued maintenance and use of Personally Identifiable Information belonging to Plaintiff and Class members, and its retention of Plaintiff and Class members' monies—MGM has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members. MGM continues to benefit and profit from its retention and use of the Personally Identifiable Information and Plaintiff and Class members' monies, while Plaintiff and Class members have suffered the lost integrity of their Personally Identifiable Information and their loss of monies to MGM.

98.    MGM's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and use of Plaintiff and class members' Personally Identifiable Information, while at the same time failing to secure that information from outside intrusion.

99.    Under the common law doctrine of unjust enrichment, it is inequitable for MGM to retain the benefits it received—and is still receiving—without justification, from Plaintiff and Class members. MGM's retention of these financial and informational benefits is inequitable under the circumstances.

100.    MGM is therefore liable to Plaintiff and Class members for restitution in the amount of the benefit conferred on MGM as a result of its wrongful conduct, including specifically the loss of the benefit of their bargain with MGM as Plaintiff and Class members would not have paid MGM for goods and services or would have paid less for such goods and services but for MGM's misconduct alleged herein; the value to MGM of the Personally Identifiable Information that was stolen in the data breach, and the profits realized by MGM as a

result of its failure to spend a reasonable amount of its income on data security measures, and the value that Plaintiff and Class members paid MGM .

**COUNT VI – BREACH OF CONFIDENCE**

**On behalf of the Nationwide Class**

101.    Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

102.    Plaintiff and Class members were required to provide their Personally Identifiable Information to MGM as a condition of booking rooms and retaining MGM's services.

103.    The Personally Identifiable Information conveyed to MGM by Plaintiff and Class members was unique to them, and the Personally Identifiable Information conveyed is widely known to be of a confidential nature because it can be used against individuals for nefarious purposes, such as identity theft.

104.    All reasonable persons and businesses understand that the Personally Identifiable Information conveyed by Plaintiff and Class members is unique and must be protected from unauthorized access in order to prevent criminal activity.

105.    MGM explicitly and implicitly promised to maintain the confidentiality of the Personally Identifiable Information conveyed to it, to use the Personally Identifiable Information only for essential business purposes as explicitly or implicitly authorized by customers, and to protect the information from unauthorized access.

106.    Despite knowing the uniqueness and sensitivity of Plaintiff and Class members' Personally Identifiable Information, MGM permitted or failed to prevent unauthorized access to it.

107.    MGM know that this unauthorized access would cause Plaintiff and Class members harm, and the data breach did in fact cause Plaintiff and Class members harm, as explained above.

108.    MGM is therefore liable for breach of confidence to Plaintiff and Class members, and the resulting damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and services or would have paid less for such goods and services

but for MGM's misconduct alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

**COUNT VII – VIOLATION OF NEVADA'S CONSUMER FRAUD ACT**

**Nevada Revised Statutes 41.600**

**On behalf of the Nationwide Class**

109.     Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

110.     MGM is a citizen of Nevada.

111.     MGM violated Nevada's Consumer Fraud Act by engaging in unfair and unlawful acts and practices that constitute acts of "consumer fraud" as defined in NRS 41.600(2)(e) with respect to the goods and services it provided to the Nationwide Class, including but not limited to the following:

a.   by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard Personally Identifiable Information from unauthorized disclosures, releases, data breaches, and theft;

b.   by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for the California Subclass' personal information;

c.   by Personally Identifiable Information to MGM that MGM's data security systems failed to meet legal and industry standards for the protection of the California Subclass' personal information; and

d.   by soliciting and collecting Plaintiff and the California Subclass members' Personally Identifiable Information with knowledge that the information would not be adequately protected and by storing that personal information in an unsecure electronic environment.

112.     MGM's conduct violated NRS 598.0917(7) because it constituted a tender of "goods advertised for sale…or tendering terms of sale or lease less favorable than the terms

advertised," i.e., goods offered for sale by credit card without the corresponding promise that its customers Personally Identifiable Information would be kept reasonably safe from harm.

113.   MGM also breached its duty under NRS 603A.210, which requires any data collector "that maintains records which contain personal information" of Nevada residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, … use, modification or disclosure." MGM did not take such reasonable security measures, as shown by a system-wide breach of payment processing systems.

114.   MGM also breached its duty under NRS 603A.215, which requires any data collector doing business in Nevada who accepts payment cards in connection with a sale of goods or services to "comply with the current version of the…PCI Security Standards Council…with respect to those transactions." On information and belief, MGM failed to adhere to PCI standards, and was grossly negligent because the violation occurred in multiple resorts across the United States.

115.   Additionally, NRS 598.0923(3) provides that a violation of any federal or Nevada law constitutes consumer fraud. Thus, MGM violations of the FTC Act, NRS 598.0917(7), and NRS 603A violated NRS 598.0923(3).

116.   In turn, MGM' violations of NRS 598.0923(3), NRS 598.0917(7), and NRS 603A constitute "consumer fraud" for purposes of NRS 41.600(2)(e).

117.   The conduct and practices described above were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the Nationwide Class members.

118.   MGM's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws like the FTC Act.

119.   The harm these practices caused to Plaintiff and the Nationwide Class members outweighed their utility, if any.

120.   As a direct and proximate result of MGM's acts of unfair and unlawful practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses

of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and services or would have paid less for such goods and services but for MGM's misconduct alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

121.    MGM knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff and the Nationwide Class members' Personally Identifiable Information and that the risk of breach or theft was highly likely.

122.    MGM's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the members of the Nationwide Class.

123.    Plaintiff seeks relief, individually and on behalf of the Nationwide Class, under NRS 41.600, et. seq., for restitution, injunctive relief, along with attorneys' fees and costs, and an order declaring that MGM's data security procedures failed to meet applicable security standards and the duty of care it owed its customers.

## COUNT VIII – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. Prof. Code § 17200, et seq.
### On behalf of the California Subclass

124.    Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

125.    Plaintiff is a resident of and citizen of California.

126.    MGM violated California Business and Professions Code § 17200, et. seq., by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitutes acts of "unfair competition" as defined in Cal. Bus. Prof. Code. § 17200 with respect to the goods and services it provided to the California Subclass, including but not limited to the following:

a.  by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard Personally Identifiable Information from unauthorized disclosures, releases, data breaches, and theft;

b.  by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for the California Subclass' personal information;

c.  by Personally Identifiable Information to MGM that MGM's data security systems failed to meet legal and industry standards for the protection of the California Subclass' personal information; and

d.  by soliciting and collecting Plaintiff and the California Subclass members' Personally Identifiable Information with knowledge that the information would not be adequately protected and by storing that personal information in an unsecure electronic environment.

127.    Though emanating in Nevada, it was reasonably foreseeable that MGM's conduct and practices described above would injure citizens and residents of California, including Plaintiff.

128.    The conduct and practices described above were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the California Subclass members.

129.    MGM's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws like the FTC Act.

130.    The harm these practices caused to Plaintiff and the California Subclass members outweighed their utility, if any.

131.    As a direct and proximate result of MGM's acts of unfair and unlawful practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MGM as they would not have paid MGM for goods and services or would have paid less for such goods and services but for MGM's misconduct alleged herein; losses from fraud

and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personally Identifiable Information; and an increased, imminent risk of fraud and identity theft.

132.    MGM knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff and the California Subclass members' personal information and that the risk of breach or theft was highly likely.

133.    MGM's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the members of the California Subclass.

134.    Plaintiff seeks relief, individually and on behalf of the California Subclass, under Cal. Bus. Prof. Code § 17200, et. seq., for restitution and injunctive relief, along with attorneys' fees and costs.

## COUNT IX – VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA")

### Cal. Civ. Code § 1750, et seq.

### On behalf of the California Subclass

135.    Plaintiff repeats and reasserts each and every allegation contained above as if fully set forth herein.

136.    Plaintiff is a "consumer[ ]," MGM is a "person," and MGM's resort and casino offerings constitute a "good" and/or "service" within the meaning of the CLRA. Cal. Civ. Code § 1761(a) – (d).

137.    MGM's sale and advertisement of its resort and casino offerings constitute "transactions" within the meaning of the CLRA. Cal. Civ. Code § 1761(e).

138.    The CLRA declares as unlawful the following unfair methods of competition and unfair or deceptive acts or practices when undertaken by any person in a transaction intended to result, or which results, in the sale of goods to any consumer:

(1)    Passing off goods or services as those of another.

(5)    Representing that goods…have…approval, characteristics, …uses [and] benefits…which [they do] not have…

(7)    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are another.

(9)    Advertising goods…with intent not to sell them as advertised.

Cal. Civ. Code § 1770(a)(1), (5), (7) and (9).

139.    MGM violated the CLRA by engaging in unfair and unlawful acts and practices with respect to the goods and services it provided to the California Subclass, including but not limited to the following:

a.    by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard Personally Identifiable Information from unauthorized disclosures, releases, data breaches, and theft;

b.    by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for the California Subclass' personal information;

c.    by Personally Identifiable Information to MGM that MGM's data security systems failed to meet legal and industry standards for the protection of the California Subclass' personal information; and

d.    by soliciting and collecting Plaintiff and the California Subclass members' Personally Identifiable Information with knowledge that the information would not be adequately protected and by storing that personal information in an unsecure electronic environment.

140.    MGM knew, or should have known, that such representations would mislead consumers as to alter a consumer's decision to purchase MGM's resort and casino offerings.

141.    MGM's violations of the CLRA proximately caused injury in fact to Plaintiff and the California Subclass.

142.    Plaintiff and the California Subclass members purchased MGM's resort and casino offerings on the belief that they would receive substantially safer goods and services than

they did. Indeed, no consumer would purchase the MGM's goods and services unless he or she believed that their privacy would remain protected.

143.    The safety and security of MGM's goods and services were a material factor in Plaintiff's and the California Subclass members' decision to purchase and use MGM's goods and services. Since Plaintiff and the California Subclass members would not have purchased the goods and services had they known that they were unsafe and that hackers may gain access into their private lives through, for example, MGM's M life Rewards program, Plaintiff and each California Subclass member were injured by the mere fact of their purchase.

144.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiff, individually and on behalf of the other members of the California Subclass, seeks all non-monetary relief allowed by law; injunctive and declaratory relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the Cal. Civ. Code § 1750. Plaintiff reserves the right to amend this complaint to seek monetary damages.

145.    In accordance with California Civil Code § 1782, Plaintiff notified MGM via certified mail, return receipt requested, of these alleged violations of the California Consumers Legal Remedies Act and demanded that MGM correct, repair, replace or otherwise rectify such violative conduct.  MGM has not corrected, repaired, replaced, or otherwise rectified its conduct, nor has MGM responded to these demands.

### PRAYER FOR RELIEF

146.    Wherefore, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests judgment against MGM as follows:

a. For an order certifying this action as a class action, defining the Class and Subclass as requested herein, appointing the undersigned as Class counsel, and finding Plaintiff to be a proper representative of the Class and Subclass.

b. For a permanent injunction and any other equitable relief as necessary to protect the interest of the Class, including:

i. An order declaring MGM's conduct alleged herein unlawful and prohibiting MGM from engaging in the wrongful and unlawful acts.

ii. Requiring MGM to develop a security protocol to include standards to:

1. protect all data collected or received through the course of its business in accordance with the FTC Act and other federal, state, and local laws, and best practices under industry standards;

2. design, maintain, and test their computer systems to ensure that Personally Identifiable Information in their possession is adequately secured and protected;

3. engage third-party security auditors and internal security personnel to conduct testing, including simulated attacks, penetration testing, and audits on MGM's systems on a periodic basis and ordering it to promptly correct any problems or issues detected by those auditors;

4. audit, test, and train their security personnel to run automated security monitoring, aggregation, filtering and reporting on log information in a unified manner;

5. encrypt all Personally Identifiable Information;

6. purge, delete, and destroy in a reasonably secure and timely manner any Personally Identifiable Information no longer necessary for their provision of goods and services;

7. routinely and continually conduct internal training and education to inform personnel how to identify and contain a breach and what to do in response;

8. deploy appropriate and up-to-date SPAM filters, web filters, and antivirus solutions;

9. employ standards for password expiration and complexity; and

10. educate its employees and conduct training sessions with mock phishing exercises.

iii. Requiring MGM to disclose any future data breaches in a timely and accurate manner.

c.  An award of compensatory damages, restitution, statutory damages, punitive damages, and/or attorneys' fees and costs recoverable under the claims pleaded herein, as well as any such other relief as is just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

147.  Plaintiff demands a trial by jury on all issues so triable.

DATED this 27th day of February, 2020.

**THE BOURASSA LAW GROUP**

*/s/ Mark J. Bourassa, Esq.*
MARK J BOURASSA, ESQ.
Nevada State Bar No. 7999
JENNIFER A. FORNETTI, ESQ.
Nevada State Bar No. 7644
2350 W. Charleston Blvd., #100
Las Vegas, Nevada 89102
Telephone: (702) 851-2180
Fax: (702) 851-2189
Email:  mbourassa@blgwins.com
           jfornetti@blgwins.com
*Attorneys for Plaintiff*


To be admitted pro hac vice:


Gary F. Lynch
Kevin W. Tucker
Jamisen A. Etzel
CARLSON LYNCH LLP
1133 Penn Avenue, Floor 5
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246

Todd D. Carpenter (pro hac vice forthcoming)
CARLSON LYNCH LLP
1350 Columbia St. Ste. 603
San Diego, California 92101
Telephone: (619) 762-1900
Facsimile: 619) 756-6991

tcarpenter@carlsonlynch.com

Katrina Carroll (pro hac vice forthcoming)
**CARLSON LYNCH LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Telephone: (312) 750-1265
Facsimile:   (412) 231-0246
kcarroll@carlsonlynch.com


Counsel seeking to be admitted pro hac vice will
comply with LR IA 11-2 within 45 days.

*Attorneys for Plaintiff and the Proposed Classes*

CLASS ACTION COMPLAINT- 35